## WILLIAM F. WELD *et al.*

### *v.*

### JAMES H. REES.

1. DEED OF TRUST—*sale under—notice.* Where a deed of trust declared that, in case of default in the payment of the debt, the trustee might sell the trust property " after publishing a notice in a newspaper published in the city of Chicago, ten days before the day of such sale," and the first insertion of a notice was in a daily paper, published twelve days before the sale, excluding the latter day, in each daily paper during the time, but no papers were issued on the intervening Mondays: *Held,* that the requirements of the law were observed, and there was the required notice. The case of *Scammon* v. *City of Chicago,* 40 Ill. 146, is unlike this case, and does not control it.

2. SAME—*sale by trustees.* Where a deed of trust is to two trustees, and authorizes either to sell upon default in payment of the debt, and both joined in giving notice and in executing a deed to a purchaser, although but one attended and conducted the sale, the power was well executed, and there was no deviation from the terms of the trust deed.

3. SAME—*prior mortgage for same debt.* Where a party owed another and executed a mortgage to secure its payment, which was recorded, and the debtor subsequently executed a deed of trust on the same land to secure the same debt,

which was also recorded, and on a default the trustees sold the premises, the record of these instruments was notice to the world that they were to secure the same debt, and the trustees were not required to give notice that the debt was the same, and no person could have been misled by a failure to give such notice.

4. SAME—*purchase by agent of the creditor.* Where the agent of the creditor bid off the property in his own name at the trustees' sale, paid no part of his bid, received a deed and conveyed the premises to his principal: *Held,* that this was not irregular, as it would be an idle ceremony to have paid his principal's money to the trustees and then for them to have paid it back to the creditor. The law does not require the performance of useless acts.

5. SAME—*sale at sacrifice.* Where property sold at a trustees' sale for two-thirds of its value, and the sale was unattended with fraud, this is not such inadequacy of price as amounts to a fraud, and requires the sale to be set aside, and the debtor to be permitted to redeem. The debtor agreed that it should be sold to the highest bidder, and being a legal contract, a court of equity will not make a different one for him. He could have inserted other conditions in the deed.

6. SAME—*under trust deed—judgment for balance of debt—redemption.* Where a sale was had of trust property, which satisfied but a portion of the debt, and the creditor subsequently sued and recovered judgment and collected the remainder of his debt: *Held,* that the recovery of the balance, by judgment, did not open the sale and authorize the debtor to redeem the trust property. A trustee's sale bars the debtor's equity in the trust property precisely as would a decree and sale by a foreclosure. A foreclosure by the acts of the parties held to have the same binding effect as a foreclosure under a decree.

7. SAME—*fraud—departure from authority.* If such a sale is fraudulent, or if the trustee, in conducting it, departs from his authority conferred by the declaration of the trust, equity will unhesitatingly afford the debtor relief.

WRIT OF ERROR to the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

The facts in this case are fully stated in the opinion.

Mr. GEORGE PAYSON and Mr. C. A. GREGORY, for the plaintiffs in error.

Mr. JAMES L. STARK, for the defendant in error.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a bill in chancery, filed by defendants in error, on the 1st day of April, 1867, in the Superior Court of Chicago, to redeem a lot in the city of Chicago, from a mortgage and deed of trust. On the 1st day of December, 1854, defendant in error, being the owner of the lot in controversy, executed a mortgage to one Richard K. Swift to secure the payment of five thousand dollars, for which he also gave five bonds of one thousand dollars each, payable six years after date, with ten per cent. interest, payable semi-annually, and for the interest, coupons were attached to the bonds. The mortgage was acknowledged on the 11th, and recorded on the 29th of the same month.

On the 27th day of the next March, defendant in error executed a trust deed for the same lands to Grant Goodrich and George Scoville, as trustees, to secure the same debt, authorizing them to sell the premises, in case of default in the payment of principal or interest, at public auction, after publishing a notice in a newspaper published in the city of Chicago, ten days before the day of sale. On the 1st day of January, 1856, defendant in error executed a mortgage on the premises, with other real estate, to Frederick Bronson, of the city of New York, to secure the performance of certain covenants previously entered into by defendant in error.

Previous to the 13th day of February, 1862, William F. Weld, one of the plaintiffs in error, became the purchaser of the bonds, and on that day Goodrich, one of the trustees, sold the premises to one William H. Brooks, who was the highest bidder, at $4,000, and the trustees united in executing a deed to Brooks. It seems that Charles A. Gregory was acting as attorney for Weld, and employed Brooks to bid in the property at the sale. He paid no consideration, and on the 1st day of March, 1862, conveyed the same to Weld and received no consideration from him, having acted as his agent in the purchase.

The notice of the sale was published in the Chicago Morning Post—the first on the first day of the month, and the last on the day of the sale. No paper being issued on Monday, there were but eleven days that it appeared in the paper, and two of them were on the Sundays that intervened. Weld went into possession immediately after the sale. Subsequently, Bronson being about to foreclose his mortgage, defendant in error conveyed this lot, and other property, by quit-claim deed, which it embraced, to Bronson, to avoid expense, but Bronson's attorney refused to receive the deed, and defendant in error had it recorded. Weld, on the 5th day of March, 1867, had a judgment, by confession, rendered against defendant in error, for the unpaid balance of the bonds, upon which an execution was issued and levied upon the property of defendant in error, and the same was subsequently paid by him.

The bill was filed against plaintiffs in error, praying that complainant be permitted to redeem by paying such sum as should be found equitably due to Weld, and that the deed to Bronson be decreed to be void.

It appears that on the 5th day of April, 1867, Weld sold and conveyed the premises to John T. Noble and Francis B. Little. This deed was recorded in the proper office on the 13th day of the same month. Answers were filed to the bill, and Noble and Weld filed their cross bill, claiming that they are *bona fide* purchasers; that defendant in error is estopped from asserting title, by executing the quit-claim deed to Bronson. Answers were filed to the cross bill. On the hearing, the court below found that defendant in error was entitled to redeem, referred the same to ascertain the amount he should pay, and that the quit-claim deed to Bronson be declared void. The master reported the amount due; his report was confirmed, and a decree was rendered allowing a redemption. The record is brought to this court, and various errors are assigned.

It is urged in affirmance of the decree, that the notice of the time and place of the sale was insufficient, as there were not ten papers containing the notice issued, without including those issued on one of the Sundays; but there were twelve days, excluding the day on which the sale was made, after the first insertion. The deed of trust provides, that,

"In case default be made in the payment of said bonds or coupons, or any or either of them, or any part thereof, according to the tenor and effect of the same, respectively, within thirty days after the maturity thereof, then the said Grant Goodrich and George Scoville, or either of them, on application of the said Richard K. Swift, or his assigns, or any or either of them, or any holder of any of the above described securities, after publishing a notice in a newspaper published in the city of Chicago, ten days before the day of such sale, to sell the said premises, and all right and equity of redemption of the said parties of the first part, their heirs and assigns, at public auction, at the north door of the court house in the city of Chicago, to the highest bidder for cash, at the time mentioned in such notice, and to make, execute and deliver to the purchaser or purchasers thereof, a deed or deeds for the premises so sold."

It will be observed that the language does not, in terms, require notice to be published by ten daily insertions, or a notice for ten days, the first insertion being ten days before the sale. If it had, then there might be some question as to the sufficiency of the notice. But the language is, "after publishing *a notice* in *a newspaper* published in the city of Chicago, ten days before the day of such sale." Had there been but one insertion, and that on the first day of the month, it would have been a notice in a newspaper published ten days before the 13th of the month. The language, in terms, does not require, nor does it import, that the publication shall be a continuous one. Had it been in the country, where but weekly papers are published, and this language had been

used, as it usually is, no one could or would contend, that the sale could not be made until the publisher had changed his paper from a weekly to a daily, and the notice inserted for ten successive days. In such a case an insertion in a weekly paper would answer the requirement. The language employed in this case would seem to have been employed to exclude the idea that the notice should be continuous, as it has no terms which would imply successive or continuous publications. It speaks of but one notice and one paper, and that ten days before the sale. The language employed in this deed is not similar to that used in the law, upon which the case of *Scammon* v. *The City of Chicago*, 40 Ill. 146, was decided; nor does the language, in this case, require or admit the same interpretation. Hence, that case can not control this.

There can arise no question in this case as to the power of one trustee to conduct the sale, as the trust deed expressly authorizes it, and they both joined in the deed to the purchaser. If such an objection could be raised in any case, it cannot in this, as the power in that respect has been fully complied with in conducting the sale.

It is urged, in support of the decree, that the trustees should have notified the public that the mortgage to Swift was to secure the same, and not another and different debt. The public were notified of that fact by the public records. The mortgage and the deed of trust described the same bonds and coupons, and they were both recorded, and any person seeing the mortgage and deed of trust of record, would have known that the two instruments were given to secure the same debt. And the deed of trust expressly authorizes a sale of Swift's equity of redemption. No person could have been misled by the inspection of the two instruments. The description in both was the same as to dates, amounts, character and description of the instruments and persons. Again, the trustees pursued their power in making the sale, and we are unable to perceive how any person of ordinary intelligence could have

55—48TH ILL.

supposed that there were two debts secured by these instruments. There is no force in this objection.

It is insisted that Brooks paid no consideration when he purchased. As the bidder for Weld, it was not material that he should. When Weld's attorney employed him to bid for Weld, his acts, in that respect, were the same as if performed by his principal; and it would have been idle for Weld, the creditor, had he bid in person, to have paid the amount of his bid to the trustees, and for them to have gone through the useless ceremony of receiving and paying back the money. And on the principle that what one does by another he does by himself, it would have been equally unnecessary for Brooks to have paid Weld's money to the trustees, and for them to have paid it to Weld. The law never requires the performance of useless acts, or mere ceremonies producing no beneficial results.

It is next urged, that the property was sold at such a sacrifice as to require the sale to be set aside, and permit a redemption. It has been repeatedly held, and it is regarded as the law of this court, that a sale will not be set aside for mere inadequacy of price, unless it is so gross as to amount to a fraud upon the owner. In this case the lot sold for four thousand dollars, in February, 1862. And it appears that defendant in error made efforts to sell, but failed to procure the amount of the debt, which was then about six thousand dollars. Defendant in error testifies that he attempted to find a purchaser at the value of the lot at that time, but without success. He says the times were very hard, and real estate unsalable. Gregory testified that defendant in error offered to quitclaim the lot in satisfaction of the debt. Some of the witnesses say that the lot was then worth from seven to eight thousand dollars, and Ogden thinks he would have regarded it as a bargain and have purchased it at five thousand. When fixing its value at from seven to eight thousand, the witnesses must refer to sales on time, as the lot was sold to Little and

Noble, five years afterwards, for ten thousand dollars, on the usual terms as to time of payment. And Ogden says he thinks he would have purchased at three thousand less than he fixes the value. And when defendant in error offered to quitclaim the property to Weld in satisfaction of the debt, which was six thousand dollars, and endeavored to sell, but could not find a purchaser, we must conclude that its cash value was less than six thousand dollars.

If it were even worth that sum, we could not say that when it brought two-thirds of its value, the sacrifice is so gross as to amount to a fraud. It is rare, and the debtor is fortunate if his property ever brings its full value when offered at auction and for cash. The law never has undertaken to guarantee that property thus sold shall bring its full value. To hold that it should, would obstruct, if not prevent, the collection of all debts. That hardships may occur under these irredeemable sales is true, but it is the fault of the contract of the parties, and not of the law. The parties could have inserted a clause that the property should bring a specific sum, or a certain part of its value, before it should be sold, or that it should be appraised and sold for the appraisement, or a specified portion thereof; but they failed to do so, and on the contrary, they did agree that it should be sold to the highest bidder. If equity were now to interfere, and say that it should have sold for more than the highest bidder offered at the sale, it would be making a new agreement for the parties. If, however, there was fraud, which prevented the agreement of the parties from being fairly carried out, and it resulted in loss to the debtor, then a court of equity would relieve. In this case the inadequacy of price was not such as to require the sale to be set aside, and we see no evidence of fraud in the sale.

Nor is there any force in the objection that the trustees failed to remove the mortgage given to secure this debt. There was nothing in the declaration of the trust which required it. They were only authorized and required to sell

upon a default in payment. But the mortgage being manifestly to secure the same debt, it was not a cloud, and could not have operated to depress the biddings. The sale under the trust deed, was, as all persons could see and must have known, another mode, agreed upon by the parties, to foreclose and bar the equity of redemption of defendant in error.

It is also insisted, that by taking judgment for the unsatisfied balance of the notes and collecting the money, Weld thereby opened the foreclosure by the sale of the property, and thereby let defendant in error in to redeem. In support of this proposition, reference is made to several adjudged cases of courts in other States. In the case of *Weiner* v. *Heintz*, 17 Ill. 259, it was held, that on a foreclosure of a mortgage and a sale of the mortgaged premises to the mortgagee, and which had passed redemption, was not opened to redemption by a suit and recovery on the portion of the mortgage debt not satisfied by the foreclosure and sale. That decision was made many years since, and it has been subsequently recognized by this court, and it must be held as settling the law on that question. We are satisfied with the principles upon which it is based. We regard it as equitable and just. Titles to a vast amount have been acquired under it, and as it has become a rule of property, and if it were now overruled, it would operate to divest titles, to create liabilities on covenants entered into under the belief that it is a rule of property. We therefore feel no disposition to overrule it, and thus unsettle titles, simply that our decisions may conform to those of some other court, however respectable, as authority. If the rule operated unjustly, and was producing injurious consequences in its application, we should not hesitate to overrule or modify it at once. But we fail to see its injustice, or even hardship in its application, as a rule. We do not, therefore, feel disposed to review the cases referred to in the brief for defendant in error, as we regard the rule as settled.

It is, however, attempted to distinguish a case of foreclosure by the acts of the parties themselves, under and in pursuance to their agreement, from a foreclosure by a decree in equity. We are unable to perceive any difference, in principle, in the two cases. When a foreclosure is had in equity, the court only does what the mortgagor should have done. It compels the sale of the property, to discharge the debt which should have been paid. And to do so, the equity of redemption must be barred, either by decreeing a strict foreclosure, or by selling the property. Otherwise, the security would be unavailing. And with persons competent to contract, under no disability, no possible reason is perceived why they may not legally agree, that, if default is made in the payment of the debt, a third person, selected by the parties, or even the mortgagee himself, may, in the mode, at the time, and on the terms they may specify, sell the property, and thus bar the equity of redemption. The law has not prohibited it, nor is it opposed to public policy. Why may not the solemn contract of the parties, deliberately made, not prohibited by law, be executed, and, when executed, why not be as conclusive as the decree of a court? The mortgagor may, by conveyance, bar his equity of redemption as effectually as by a sale under a decree of foreclosure. And, if so, why may he not do so through and by an attorney in fact, or by a trustee duly authorized? No valid reason is perceived, nor has any been suggested. We are, therefore, clearly of the opinion, that by suing upon, and recovering the unpaid balance of the mortgage debt, Weld did not open the sale and let defendant in error in to redeem from the trustees' sale.

It is true, that such sales may be liable to abuse, and for that reason courts will guard the rights of the parties with scrupulous care, and when it appears that fraud has been perpetrated, or a deviation from the authority conferred by the deed, relief will be unhesitatingly granted. *Longworth* v. *Butler*, 3 Gilm. 44. But, until fraud does appear, the parties must be left

to their rights as settled and fixed by their contract, legally made.

For these reasons, we are of the opinion that the court below erred in decreeing a redemption, and the decree must be reversed and the cause remanded.

*Decree reversed.*